## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DR. KAROLINA MARCINIAK-DOMINGUES
GONCALVES AGRA,

                              Plaintiff,

  - against –

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, ROCKEFELLER UNIVERSITY,
FREDERICO AZEVEDO and WINRICH
FREIWALD,

                              Defendants.

Civil Case No. 1:23-cv-10305-JPC

**AMENDED COMPLAINT
AND DEMAND FOR JURY
TRIAL**

Plaintiff DR. KAROLINA MARIA MARCINIAK-DOMINGUES GONCALVES AGRA

("Plaintiff" or "Marciniak"), by and through her attorneys, Shegerian & Associates, as and for her

Complaint against Defendants MASSACHUSETTS INSTITUTE OF TECHNOLOGY

("Defendant" or "MIT"), ROCKEFELLER UNIVERSITY ("Defendant" or "RU"), FREDERICO

AZEVEDO ("Defendant" or "Azevedo") and WINRICH FREIWALD ("Defendant" or

"Freiwald"), states and alleges on information and belief as follows:

## PRELIMINARY STATEMENT

Defendants RU, MIT, Azevedo and Friewald intentionally discriminated against

Plaintiff based on her gender, fostered a hostile work environment, sexually harassed her

and subjected her to retaliation ultimately resulting in termination, abruptly ceasing her research, reputational damage and economic damages. Despite numerous complaints, Defendants allowed this discrimination, harassment and retaliation to persist, inflicting upon Plaintiff severe emotional distress. Furthermore, Defendants retaliated against Plaintiff after she lodged complaints opposing the discrimination, sexual harassment by both Defendants Freiwald and Azevedo, rape by Azevedo and retaliation causing international infliction of emotional distress. The retaliation culminated in the unlawful termination of Plaintiff's employment on or about November 30, 2021 despite her stellar performance as a Post-doctorate research student working in Freiwald's laboratory researching Intuitive Physics. Additionally, Plaintiff Marciniak asserts claims against all Defendants under the New York City Gender-Motivated Violence Act based on the sexual assault and sexual harassment she endured permitted due to the nine year look back period under the Act. Throughout her employment, Plaintiff was subjected to a hostile work environment, sexual assault and sexual harassment, all of which complaints were not properly investigated, ignored, covered-up through a concerted effort by Defendants or outright dismissed.

## NATURE OF THE ACTION

1.      This action is brought pursuant to the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e *et seq.* ("Title VII"), the New York State Executive Law ("NYSHRL") § 296, *et seq.*, the New York City Admin. Code § 8-101, *et seq.* ("NYCHRL"), the New York Adult Survivors Act ("ASA"), the New York City Gender-Motivated Violence Act ("GMVA"), a common law claim for intentional infliction of emotional distress, and any such remedies the Court deems just and proper.

2.      Plaintiff brings this action against Defendants for economic, non-economic, compensatory and punitive damages, pre-judgment interest and costs and reasonable attorneys' fees.

**JURISDICTION AND VENUE**

3.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because our statutory claims present federal questions over which this Court has jurisdiction. Plaintiffs also assert state-law claims over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

4.   Plaintiffs assert supplemental State law claims pursuant to the New York State Constitution, New York Executive Law § 296, *et seq*. and New York City Admin. Code § 8-101, *et seq.*

5.   Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, and application and enforcement of Defendants' equal employment opportunity ("EEO") policies, affecting the hiring, promotion, work assignments, discipline and termination of its employees, may be found in this District.

6.   All conditions precedent to jurisdiction have occurred or been complied with including, and in particular:

a.   Within the time prescribed by law, Plaintiff filed a complaint[1] with the New York State Division of Human Rights ("NYSDHR") on or about May 18, 2021 alleging violations of federal law including, but not limited to, Title VII of the Civil Rights Act of 1964. Within the time prescribed by law, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about June 7, 2022. A Dismissal and Notice of Right to Sue issued by the EEOC on March 21, 2023.

7.   On or around November 22, 2023, a copy of this Complaint was mailed to the New York State Division of Human Rights, the Attorney General Office and the New York State

Department of Labor, thereby satisfying the notice requirements of the New York State Human Rights Law and N.Y. Civ. Rights § 40-d.

## JURY DEMAND

8.      Pursuant to Fed. R. Civ. P. 38(b), Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint.

## PARTIES

9.      *Plaintiff:*  Plaintiff Dr. Karolina Marciniak-Domingues Goncalves Agra is, and at all times mentioned in this Complaint was, a resident of the State of New York.

10.     Plaintiff Dr. Karolina Marciniak-Domingues Goncalves Agra had been continuously employed by Defendants from in or about September 2016 until the date of her termination on or about November 30, 2021.

11.     *Defendants:* Upon information and belief, Defendant MIT is, and at all times mentioned in this Complaint was, incorporated under the laws of the State of Massachusetts, operates in the State of Massachusetts and is authorized to operate in the State of New York and qualified to do business in New York State.

12.     Upon information and belief, Defendant MIT is, and at all times mentioned in this Complaint was, incorporated under the laws of the State of Massachusetts, operates in the State of Massachusetts and is authorized to operate in the State of New York and qualified to do business in New York State.

13.     Upon information and belief, Defendant RU is, and at all times mentioned in this Complaint was, incorporated under the laws of the State of New York and is authorized to operate in the State of New York and qualified to do business in New York State.

14.     Upon information and belief, Defendant AZEVEDO is, and at all times mentioned in this Complaint was, a resident of the State of New York. At all times relevant, he was employed

by Defendant MIT.

15.     Upon information and belief, Defendant AZEVEDO, a Teaching Assistant, individually and in his official capacity, an agent, employee, licensee, servant, supervisor and Teaching Assistant was employed by Defendants.

16.     Upon information and belief, Defendant AZEVEDO, as a Teaching Assistant, individually and in his official capacity, acted as an agent, employee, licensee, servant, supervisor and Teaching Assistant with all the actual and/or perceived/apparent authority granted, allotted and entrusted to him by Defendants in accordance with his official duties, position, rank and title as an employee of Defendants.

17.     Upon information and belief, Defendant FREIWALD is, and at all times mentioned in this Complaint was, on information and belief, a resident of the State of New York. At all times relevant, he was employed by Defendant RU.

18.     Upon information and belief, Defendant FREIWALD, a professor, individually and in his official capacity, an agent, employee, licensee, servant, supervisor and professor was employed by Defendants.

19.     Upon information and belief, Defendant FREIWALD, as a professor, individually and in his official capacity, acted as an agent, employee, licensee, servant, supervisor and professor with all the actual and/or perceived/apparent authority granted, allotted and entrusted to him by

Defendants in accordance with his official duties, position, rank and title as an employee of Defendants.

20.   Upon information and belief, Defendants owned, managed, controlled, maintained, employed and/or supervised Defendants AZEVEDO and FREIWALD, individually and in their official capacities.

21.   *Relationship of defendants:*  All Defendants compelled, coerced, aided, and/or abetted the discrimination, disparate treatment, harassment, retaliation, aiding and abetting resulting in wrongful termination alleged in this Amended Complaint, which conduct is prohibited under federal law including, but not limited to, Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C.A. §§ 2000e, *et seq*., the NYSHRL § 296, *et seq*., NYC Admin. Code  § 8-107, *et al*. and the GMVA. All Defendants were responsible for the events and damages alleged herein,  including on  the  following bases:

(a) Defendants committed the acts alleged; (b) at all relevant times, one or more of the Defendants was the agent or employee, and/or acted under the control or supervision, of one or more of the remaining Defendants and, in committing the acts alleged, acted within the course and scope of such agency and employment and/or is or are otherwise liable for Plaintiff's damages; (c) at all relevant times, there existed a unity of ownership and interest between or among two or more of the Defendants such that any individuality and separateness between or among those defendants has ceased, and defendants are the alter egos of one another. Defendants exercised domination and control over one another to such an extent that any individuality or separateness of Defendants does not, and at all times herein mentioned did not, exist. Adherence to the fiction of the separate existence of Defendants would permit abuse of the corporate privilege and would sanction fraud and promote injustice. All actions of all Defendants were taken by employees, supervisors, executives, officers, and directors during employment with all Defendants, were taken on behalf

of all Defendants, and were engaged in, authorized, ratified, and approved of by all other Defendants.

22.     Defendants both directly and indirectly employed Plaintiff as defined by federal law including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*., the NYSHRL and ASA.

23.     In addition, Defendants AVEZEDO and FREIWALD compelled, coerced, aided and abetted the discrimination, sexual harassment and retaliation, which is prohibited under federal law including, but not limited to, Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C.A. §§ 2000e, *et seq.,* the NYSHRL, the ASA and the GMVA.

24.     Finally, at all relevant times mentioned herein, all Defendants acted as agents of all other Defendants in committing the acts alleged herein.

## STATEMENT OF FACTS

25.     *Plaintiff's hiring:* In or about September 2016, Plaintiff Karolina Marciniak Agra, also known as applied for a Post Doctorate position with Defendant RU, but based on her qualifications, Defendant Freiwald hired Plaintiff Marciniak for the position she was qualified for. After Plaintiff joined the team, no performance reviews/evaluations were held. Immediately thereafter, Rockefeller University hired Plaintiff. She held the title of Post Doctorate and made approximately $75,000 annually. Plaintiff reported directly to Freiwald as a W-2 employee. Plaintiff's research focused on Intuitive Physics.

26.     Plaintiff Marciniak was a dedicated and qualified employee of Defendants beginning her employment in or about 2016 where she was employed as a Post Doctorate.

27.     *Plaintiff's job performance:* Plaintiff Marciniak was a diligent, hardworking employee and researcher in Defendants' laboratories until she was terminated on or about

November 20, 2021 by Defendant Freiwald stating that her contract would be canceled despite previous email communications from him affirming the importance of her work to Defendants and proficiency.

28.     *Defendants' adverse employment actions and behavior:* In or about November 2014, Freiwald, the Head of Laboratory of Neural Circuits at RU, reviewed Plaintiff's application while recruiting for postdoctoral openings in his laboratory at RU. Plaintiff was invited for an interview, which was scheduled to take place during a neuroscience conference in Washington D.C.

29.     In or about November 2014, on the day of the interview, Freiwald relocated the meeting to a restaurant outside of the conference center. At this location, Freiwald insisted on covering Plaintiff's bill.

30.     In or about November 2014, on the day of the interview, Freiwald relocated the meeting to a restaurant outside of the conference center. At this location, Freiwald insisted on covering Plaintiff's bill.

31.     During the course of the interview, Defendant Freiwald expressed his readiness to accept Plaintiff's application and provided her with a decision-making period until the end of the year. In an attempt to persuade Plaintiff to accept the position, Freiwald highlighted the potential for groundbreaking research in her area of scientific interest. Freiwald also emphasized the state-of-the-art technological capabilities of his laboratory. The position offered the prospect of career progression and a high likelihood of receiving a postdoctoral fellowship award with him as the host. This was presented as an opportunity for long-term but ultimately highly successful postdoctoral training, which would be unwise to decline.

32.     In or about December 2014, Freiwald conducted a Skype interview with Plaintiff's

boyfriend of eight years, who had a similar background to Plaintiff and had moved with her from Poland to Germany to earn their PhDs. Despite his qualifications, Freiwald did not extend an offer to him due to his lack of experience with non-human primates, which would be utilized in the laboratory research. This decision was made even though Freiwald had previously hired other male postdocs who lacked such expertise.

33.    Following this, Plaintiff Marciniak communicated her acceptance of Freiwald's offer and expressed her intention to relocate to New York with her boyfriend, who planned to seek employment opportunities elsewhere.

34.    In or about December 2014 to August 2015, while still completing her PhD in Germany, Plaintiff drafted a research proposal for a postdoctoral fellowship. The receipt of this fellowship was understood to determine the timing and scope of her employment in Freiwald's laboratory. Freiwald enthusiastically accepted Plaintiff's proposal. However, in or about August 2015, he allocated the postdoctoral fellowship slot application to a male postdoc already employed in his laboratory and suggested that Plaintiff apply at the next opportunity.

35.    In or about September 2015, Plaintiff visited Defendant RU to view the facilities of Freiwald's laboratory and discuss the project proposal. Contrary to Freiwald's earlier promises, Plaintiff was unable to tour the facilities. At the conclusion of her visit, Freiwald disclosed that the research Plaintiff proposed was already being pursued in the laboratory and requested that she draft another proposal.

36.    In or about October/November of 2015, this unexpected development, coupled with uncertainty about the research facilities in the laboratory, led Plaintiff to withdraw her commitment to accept the position. Despite this, she continued to receive persistent emails from Freiwald, who remained insistent on hiring her.

37.    On or about February 6, 2016, Freiwald wrote to Plaintiff expressing concern for her well-being and offering to talk with her. Plaintiff did not respond. On or about February 14, 2016, Freiwald wrote again, assuring Plaintiff that she need not feel pressured by his emails and offering his support. Plaintiff responded that she was fine but dealing with some personal matters that had left her somewhat confused. Freiwald replied on or about February 19, 2016 admitting that he had suspected she was dealing with personal issues. He then assigned Plaintiff a Defendant CBMM project expressing excitement about the potential fit and the opportunity to work closely with a professor at Defendant MIT.

38.    At this time, Plaintiff Marciniak was vulnerable due to the end of her engagement relationship. She felt that Freiwald was intruding on her personal life without her consent. Freiwald made decisions on her behalf, leaving her feeling as though she could not decline the CBMM offer, especially since Freiwald had already contacted the professor at MIT about the offer.

39.    In or about March 2016, Plaintiff planned another visit to Defendant RU to clarify the project proposal and verify laboratory facilities before committing to the position. However, a last-minute cancellation occurred due to her visa being invalid.

40.    On or about March 21, 2016, shortly after Plaintiff emailed Freiwald about the cancellation and her uncertainty on how to proceed, Freiwald arranged a private Skype call, in which he offered RU's support in securing the visa. Plaintiff understood the visa was in relation to her prospective laboratory visit to RU, as she still wanted to evaluate the laboratory facilities before committing to the job. To her surprise, immediately after the call, Freiwald sent a "New Postdoc" email to the Director of Immigration and Academic Appointments group in Human Resources, Maria Lazzaro ("Lazzaro"), who initiates postdoctoral appointments at the request of

the Head of Laboratory at RU. Freiwald copied his laboratory manager on an email with Plaintiff on the email as well with subject line, "New Postdoc". The email effectively commenced the process of her employment at RU. Initially, Lazzaro attempted to speak with Plaintiff personally about the details, however, Freiwald stepped in and spoke for her, describing her visa situation as complicated, to have Lazzaro elect a J-1 Visa sponsorship for her employment at RU that year.

41.    Plaintiff accepted the offer of employment, however, Friewald conveyed to Plaintiff RU (through his doing) had done her a huge "favor", which RU was doing in her "complicated" situation as she needed a visa to begin working in the U.S. Although she did not want to commit before seeing the laboratory, finalizing the research project and sending application for the fellowship.

42.    After accepting the position and RU's sponsorship for the J-1 visa, Plaintiff learned that an H-1B visa was more appropriate for her immigration situation.

43.    On or about September 1, 2016, Plaintiff realized Freiwald gravely misrepresented to her the state, maturity and capabilities of the laboratory facilities. When Plaintiff arrived to commence her employment, the new fMRI protocol had to be developed from scratch, and the large-scale electrophysiology method was still in the very early developmental stage. Upon arrival, she was delegated by Freiwald to travel to MIT to establish CBMM collaboration.

44.    In or about February 2017, under Freiwald's supervision, Plaintiff submitted the postdoctoral research proposal for her work. She was given prestigious 2-year Feodor-Lynen fellowship from the German Humboldt foundation, which paid 50% of her salary between September 1, 2017 to August 30, 2019. In collaboration, Defendant RU agreed to cover the remaining part of the salary to complete the project. In or about March 2017, Plaintiff was delegated to send an application for Defendant CBMM's Summer School in Woods Hole, Massachusetts that coming summer.

45.    In or about August 2017, Plaintiff attended a course in Woods Hole. She was assigned off-campus accommodation shared with Defendant Azevedo. Despite the professional circumstances, Azevedo created a party atmosphere in the cottage he and Plaintiff were assigned to reside in during the summer by Defendants and maliciously and intentionally spread false information about Plaintiff to colleagues.

46.    Azevedo invited Plaintiff to a late-night gathering, which she declined. The next morning, she discovered two (2) female students had stayed over in the college. On her last day, Azevedo offered her a room for rest during a prolonged program. As she slept, she was awakened by Azevedo and another individual, Premachandran. Azevedo violated her personal boundaries by sexually assaulting her despite her resistance and the lack of consent to the sex. Azevedo later dismissed his illegal actions, mocked Plaintiff's emotions and coerced her silence. Soon after this rape, he cornered Plaintiff insisting on her secrecy. This left Plaintiff feeling helpless and ashamed. This experience shattered Plaintiff's sense of safety and trust.

47.    In or about September 1, 2017, Plaintiff had a meeting with Freiwald concluding her business trip to Defendant CBMM's Summer School in Woods Hole. The meeting, initially scheduled in the office, was moved last minute outside the university by Freiwald. During a 40-minute walk, Freiwald persistently invaded Plaintiff's personal space, touching her lower back inappropriately and looking at her legs and buttocks. This behavior made Plaintiff extremely uncomfortable and subjected her to derogatory public social perception in the neighborhood where she lived and worked.

48.    Despite the discomfort, Plaintiff attempted to seek help from Freiwald, informing him of a "bad encounter with somebody from another institution". Freiwald, however, dismissed

the seriousness of her complaint and changed the topic, suggesting that Plaintiff should trivialize the situation and accept it as a daily-life reality of Defendant's CBMM Summer Course.

49.     Between in or about September 1, 2017 to September 7, 2017, Plaintiff confronted Azevedo about the injuries he had caused her, which he dismissed. Azevedo harassed Plaintiff through daily calls and text messages, checking on her interactions and conversations. He ordered and intimidated Plaintiff to stay silent about the sexual assault incident and pretended to be her new friend, advising her to enjoy this situation.

50.     At some point in September 2017, Plaintiff confronted Defendant Azevedo about him assaulting her, clearly stating that she remembered saying no to any sexual relations. Azevedo ridiculed her wording of the non-consensual encounter, telling her that consent did not matter. He shared a disturbing event from his graduate school further instilling fear and intimidation in Plaintiff.

51.     In or about November 2017 to January 2018, Azevedo coerced Plaintiff into participating in "three-some" sexual encounters with other women. In or about November, Azevedo insisted that Plaintiff provide accommodation for him and his female friend during their visit to New York. Subsequently, he misused Plaintiff's pictures to create a profile on Tinder, which he used to seek further "threesome" sexual encounters. In January, he attempted to coerce Plaintiff into another threesome sexual encounter. When Plaintiff refused, he immediately became aggressive towards her.

52.     In or about February 2018, Freiwald sent an email to Plaintiff and two (2) other female junior researchers in the laboratory, inviting them to accompany him to a social event the following evening. The event was to be held in the office of another Head of Laboratory at Defendant RU, where Freiwald was a guest. None of the women were familiar with or involved

in the research topic of the event. The women were asked to dress in evening outfits and their role during the event was to solely accompany Freiwald. He asked them to sit with him during a PowerPoint presentation and walk with him during a laboratory tour. This role was uncomfortable for Plaintiff, and it was socially embarrassing when external guests approached with thematic questions, expecting that her presence indicated her involvement in the research concerning the topic of the event, but she was unable to provide informed responses. Plaintiff had to explain that her sole connection to the event was that she was from Freiwald's laboratory. It was clear that she was there as his arm candy.

53.      In or about February 2018, Azevedo, while pressuring Plaintiff for accommodation at a March neuroscience conference in New York, insisted manipulatively she maintain "CBMM collegiate behavior," despite Plaintiff's consistent refusal to engage further in any sexual encounters with him. Plaintiff explicitly communicated her lack of desire for such interactions, with prior threats from Azevedo occurring in or about January 2018 to jeopardize Plaintiff's CBMM opportunities if his wishes were not met. An email from Defendant CBMM Center Manager, Kathleen Sullivan around the same time highlighted Azevedo's influential role in research seminars.

54.      On or about March 15, 2018, succumbing to pressure, Plaintiff allowed Azevedo to stay on the living room sofa in her shared two-room apartment at Defendant RU. Upon his arrival, Plaintiff directed him to the living room, yet Azevedo insisted on using Plaintiff's private bathroom, claiming a lack of guest shower. Exiting the bathroom, he initiated a conversation, shutting the door, during which Plaintiff disclosed her contraction of an HSV infection because of Azevedo's assault on another woman in Woods Hole. Expressing her fear of the infection's impact on cervical cancer risk for women, Plaintiff pleaded with Azevedo to halt his sexual

harassment, stressing the harm to women. Shockingly, Azevedo callously responded with laughter and the remark, "welcome to the population of people with STDs." Subsequently, he forcefully pushed Plaintiff onto the bed, engaging in non-consensual intercourse without a condom despite her repeated protests and attempts to escape.

55.     After the incident, Plaintiff grappled with feelings of devastation, confusion, helplessness and shame. Fearing Azevedo's influence, she attempted to quickly dismiss the traumatic experience. Enduring feelings of self-blame and regret for allowing his access to her apartment, Plaintiff resolved to prevent any future intrusions into her personal space. Despite subsequent requests, she vehemently refused any further personal contact with Azevedo in New York.

56.     In or about May 2018, during the CBMM retreat conference at MIT, Azevedo approached Plaintiff in a corridor and initiated a private conversation with her. Plaintiff expressed her disinterest and informed him of her romantic relationship and intention to marry her current boyfriend. Azevedo suggested that she end her relationship and accompany him during the upcoming CBMM Summer School, where she was recruited as a Teaching Assistant, to facilitate his interactions with female CBMM summer school students.

57.     On or about May 22, 2018, Azevedo, in his role as CBMM retreat organizer, attempted to involve Plaintiff in a social event at the CBMM retreat at MIT. He added her to his self-made Whatsapp group of event "organizers". In this group, he repeatedly used Neo-Nazi and White Supremacist terms, referring to himself as a Fuhrer. When Plaintiff refused his advances, he made derogatory comments about her Polish background in front of the conference participants.

58.     In or about June 2018, Azevedo sent a message to Plaintiff stating, "I hope you are

thinking about me and not about your stupid boyfriend". In response, Plaintiff blocked him as a contact on WhatsApp and subsequently removed Azevedo's contact from all of her social media.

59.    In or about July-August 2018, during the CBMM Summer School in Woods Hole, Plaintiff, concerned about potential harassment from Azevedo, requested her then fiancé, now husband, Plaintiff Agra, accompany her while she was set to work as a Teaching Assistant for three (3) weeks. Upon their arrival, they faced persistent scrutiny and gossip among male CBMM members affiliated with Azevedo. The program's environment lacked inclusivity for women, with lectures filled with sexist jokes and a culture endorsing private gatherings and alcohol. Plaintiff observed Azevedo informally bringing a visiting student from MIT to the School and actively pursuing female students in a sexual manner. The atmosphere seemed more akin to a men's club than a prestigious program from esteemed institutions. During a meeting between Teaching Assistants and course Directors, including Gabriel Kreiman, the School Director and Azevedo's supervisor, there was condemnation of sexual encounters between Teaching Assistants and female students during the program, but an encouragement to seek such encounters "elsewhere."

60.    Through her experience at the CBMM Summer School, Plaintiff came to understand that Azevedo had consistently abused his position's privileges for his personal agenda as a repeated sexual offender. During this course, Plaintiff had a meeting with all her supervisors to establish the next steps in the project.

61.    On or about September 24, 2018, Plaintiff had a meeting with Defendant Freiwald regarding the planning of forthcoming medical procedures. While Freiwald was available for office meetings with male postdocs and PhD students, he invited Plaintiff to a lunch meeting at the Abby, an upscale campus restaurant for colleague gatherings in a refined ambiance instead of just meeting his in office. Freiwald awaited Plaintiff in a sofa lounge near the restaurant entranceand chose a small table for two (2), despite the availability of a larger, more suitable table for

productive discussions. In an attempt to present figures prepared for the meeting, Plaintiff held her laptop until Freiwald abruptly requested it be put away, diminishing the meeting's focus and transforming it into a social encounter. Throughout the meeting, Freiwald inquired about Plaintiff's personal life instead of work, asking if she preferred older men while making physical gestures, leading to embarrassment for Plaintiff among her colleagues and the RU community.

62.     On or about March 12, 2019, Plaintiff was directed to travel to Defendant MIT for a CBMM National Science Foundation ("NSF") evaluation, where she was to present a research poster. She arrived under significant stress and fear of potential further harassment from Azevedo. Although she did not encounter him there, she learned that she would be assigned to another NSF CBMM evaluation meeting in or about May 2019. Fearing a potential encounter with Azevedo and concerned for other women in the environment, she explored the MIT website for available complaint options.

63.     In or around March 2019, Plaintiff filed an incident report with Defendant MIT's Title IX & Bias Response Office, now known as the Institute Discrimination and Harassment Response Office ("IDHR") against Azevedo in relation to a 2017 sexual assault and subsequent sexual harassment from Azevedo. The Director, Sarah Rankin ("Rankin"), followed up shortly and a phone call was scheduled for on or about March 28, 2019. Plaintiff expressed her desire to proceed with a formal complaint due to her concerns about other women in the CBMM environment and requested a no-contact order for her visits to MIT, including an upcoming one on May 7, 2019. Rankin was unsure whether MIT would be the appropriate entity to conduct an investigation into the allegations and told Plaintiff that she would discuss with other institutions so that Plaintiff could have "options".

64.     In or about early April 2019, Rankin followed up with Plaintiff after two (2) weeks and suggested that she speak directly with Rankin's counterpart at Harvard University ("Harvard") to determine whether they could offer any formal complaint options. Plaintiff agreed to consult Harvard believing that Rankin was facilitating her complaint process, which Rankin had described as "complicated". Despite expressing her reliance on MIT to prevent any encounters with Azevedo during her upcoming visit, Rankin replied that there were no restrictions placed on him at that time and that it was possible she might encounter him if they were attending the upcoming event.

65.     Around the same time period, Plaintiff filed a police report with the Falmouth Police Department, which has jurisdiction in Woods Hole, Massachusetts alleging the circumstances of Azevedo's sexual assault of her in 2017 and his subsequent sexual harassment.

66.     On or about April 18, 2019, during a telephone call with Harvard Title IX Coordinator, Jose Martinez ("Martinez"), there was discussion about whether the issue was a joint one among the universities or if there was a primary jurisdiction question. Martinez suggested that the Marine Biological Laboratory ("MBL") might be the representative of the Brain Minds and Machines group and that perhaps all five (5) institutions had joint jurisdiction over the complaint. Martinez acknowledged the complexity of the situation and committed to figuring it out.

67.     In or around May 4, 2019, as Plaintiff received no response from Martinez and grew more anxious about her impending visit to MIT, she reached out to Rankin via email. In her message, Plaintiff expressed her lack of assistance from Harvard and sought guidance regarding the jurisdiction of her complaint. She asked Rankin to inquire with Kathleen Sullivan, CBMM Managing Director, about the procedures outlined in the written assurances related to Title IX

compliance provided by CBMM either during the application process or upon receiving funding from the agency, NSF. However, Rankin did not respond until May 9, 2019

68.    On or about May 7, 2019, during a conference at Defendant MIT, Plaintiff experienced harassment and intimidation from Azevedo while she was hanging her poster. Despite her repeated pleas for protection, neither MIT nor Harvard issued a no-contact order for her upcoming visit to MIT. Given that she had heard Azevedo would be interviewed due to her filing the police report, she feared retaliation from him. Upon arriving at MIT at the scheduled time, Plaintiff reported to the conference poster session organizers as instructed in an earlier email. As she approached the poster stand, she noticed Azevedo giving the impression of being a poster session organizer, even though his name was not on the list of CBMM members participating in the event. As she picked up her poster and headed to hang it on the designated poster board, she noticed Azevedo following her.

69.    Defendant Azevedo stopped at the poster board next to hers and began offering unnecessary assistance to the individual hanging their poster there, all the while attempting to intimidate Plaintiff through his physical gestures, voice and looks. She quickly left the area. Fearing that Azevedo would approach her later, Plaintiff called the MIT Police, who then assigned a police officer to provide security for her during the poster session. Once the event at MIT concluded, she filed an incident report with the MIT police. Plaintiff reported her struggle with the institutional complaint process and the lack of information about the complaint process in the CBMM material to one of the NSF reviewers at the event, who subsequently directed her to the NSF Office of Diversity and Inclusion ("ODI") with her complaint.

70.    Regarding Plaintiff's visit to MIT on May 7, 2019, she wanted to know what kind of measures could be taken to ensure a safe environment for her. Martinez thought they could go

to Rankin on this, but since Rankin had suggested Plaintiff talk to Martinez about it, Martinez conditioned issuing the no-contact order upon Plaintiff's further intention about the formal complaint. He did not provide any further no-contact information in a follow-up email, apart from citing Harvard policy applying to sexual harassment off Harvard property.

71.    In or around May 13, 2019, Plaintiff sent an email to Rankin expressing her frustration about being sent back and forth without any clear response apart from the CBMM program being 'complicated'. This situation caused extreme stress for Plaintiff and her husband, leaving them feeling confused and misinformed. Plaintiff complained to Rankin of Azevedo's intimidating behavior at MIT during her visit and pleaded with her to conduct a formal investigation based on her complaint.

72.    Rankin replied that they were working on untangling all the complexities of the situation to figure out the appropriate entity to conduct an investigation of her complaint, should Plaintiff choose to move forward with filing. On the same day, Martinez emailed that he was still discussing with Harvard's Office of General Counsel regarding jurisdiction.

73.    On or about May 14, 2019, an incident occurred in New York. Freiwald moved a meeting with Josh Tenenbaum ("Tenenbaum"), a colleague at RU working on the same project as Plaintiff, initially scheduled on the RU campus, to a restaurant in downtown Manhattan. Fearing that refusal might be perceived as a lack of commitment to the project, Plaintiff agreed. However, Freiwald kept the conversation about the meeting place in a personal channel with Tenenbaum until he suddenly wrote to Plaintiff that they should get going. Terrified by the prospect of commuting with Freiwald downtown and recalling Freiwald's previous inappropriate behavior when moving office meetings outside the office space to the Abbey, Plaintiff left early and replied that she was already on her way. On the way back from the meeting, Freiwald

repeatedly attempted to shorten the physical distance with Plaintiff and check her out physically. While alone on the subway, Freiwald repeatedly attempted to reduce the physical distance between them, visually scanning her body and staring inappropriately at her legs and buttocks. Despite Marciniak's attempts to maintain a respectful distance, Freiwald persisted, making her feel uncomfortable. As they exited the train, Freiwald let her pass first by slapping her buttocks. His advances were unwelcome and caused Plaintiff significant discomfort. At the end of the trip, she sought a pretext to separate from him at the corner to avoid embarrassment of entering the RU campus together.

74.    On or about May 14, 2019, Plaintiff sent an email to CBMM Director, Tomaso Poggio, seeking his assistance due to her distress and confusion with the formal complaint process. Poggio did not respond to this email.

75.    On or about May 15, 2019, following Freiwald's behavior on May 14, Plaintiff shared her experiences with her female colleagues in Freiwald's laboratory. One colleague revealed that Freiwald had recently requested only the women from his laboratory to spend time with him during an RU event.

76.    Furthermore, Plaintiff received an email from Rankin stating that after consulting with individuals at Harvard and the MBL program, it was determined that MBL was the most appropriate entity to investigate the matter. The next day, Bridget Collier ("Collier") and Ann Egan ("Egan") from MBL reached out to schedule a telephone call.

77.    In or about May 20, 2019, during a phone call with Collier and Egan, they outlined the complaint process, which would involve Plaintiff submitting written information with documentary evidence and a list of witnesses, should she decide to proceed. They also referred her to speak to the RU's Title IX Coordinator and Human Resources ("HR") Director about available resources and support during this process. Desperate for help, Plaintiff immediately

contacted Virginia Huffman ("Huffman") from RU via email, and Huffman scheduled a meeting with her for the following day.

78.    On or about May 21, 2019 and 22, 2019, during meetings with Huffman, Plaintiff described the 2017 sexual assault and subsequent sexual harassment from Azevedo, as well as the ongoing complaint process, including the referral to RU and the University of Chicago and the lack of investigation into her complaints thus far. Huffman advised Plaintiff to proceed with the investigation by University of Chicago, assuring that RU would assist her in the process. Huffman scheduled a follow-up meeting for the next day, during which she provided Plaintiff with contact details for attorneys, Rebecca Zipkin and Jessica Morak and RU's mental health providers, whom Huffman familiarized with Plaintiff's case. Huffman assured Plaintiff that the services of these providers would be covered by RU.

79.    After the meeting with Huffman on or about May 21, 2019, Plaintiff submitted her written information with the list of witnesses to Collier and Egan.

80.    On or about May 28, 2019, Plaintiff had an in-person meeting with attorneys Rebecca Zipkin ("Zipkin") and Jessica Morak ("Morak") at the Sanctuary for Families location in New York. They took over her legal representation in the complaint against Azevedo and assured her that she no longer needed to advocate for herself. During the meeting, Morak agreed to handle the technicalities of retrieving WhatsApp messages to be used as evidence in the investigation.

81.    In or about June 3, 2019, Zipkin and Morak instructed via email that the investigators could proceed with notifying the perpetrator and issuing a no-contact order.

82.    In or about June 10, 2019, Plaintiff had a follow-up meeting with Huffman. Huffman received a list of Azevedo's email addresses and his visuals from Plaintiff, and implemented a redirecting routine at RU's IT and security system, such that Huffman would

receive Azevedo's emails coming to RU first.

83.    On or about July 11, 2019, investigators did not follow the procedural steps which they had described to Plaintiff during the telecall on or about May 20, 2019. Later in June, a virtual Box folder was created by the investigators. Plaintiff's written information, which she had sent on or about May 21, 2019 was renamed and uploaded as "Marciniak Statement". Azevedo had access to this information before preparing his statement. The only witness who was interviewed in the process was Xavier Boix ("Boix"), who corroborated Azevedo's story who also participating in the 2017 sexual assault of Plaintiff claiming a consensual sexual encounter.

84.    On or about August 11, 2019, the outcome of the investigation was announced, which stated a lack of probable cause that Azevedo broke any University of Chicago policies. Plaintiff was not allowed to appeal this outcome.

85.    In or about September 2019, in New York, Freiwald delegated Plaintiff by email to remotely attend that day's CBMM weekly research seminar and provide a summary report for him. When Plaintiff connected remotely, she unexpectedly encountered Azevedo on the screen, who appeared to be the research seminar host.

86.    In or about October 2019, during a casual discussion of her results with a senior female PhD student in the laboratory, Plaintiff was suggested to invite Freiwald for lunch to facilitate the progress of her work. She declined this suggestion, understanding it to be a common strategy employed by Freiwald to coerce women in the laboratory who depended on him for their work into social encounters. To avoid any further socially suggestive situations with Freiwald, she systematically chose the earliest morning hours for office meetings with Freiwald, hoping that the meetings would remain professional.

87.    At the same period, Plaintiff was contacted by Azevedo's former girlfriend, who had ended their relationship due to his abuse in or about August 2017. She was willing to

corroborate Plaintiff's complaint about Azevedo's sexual harassment. Plaintiff relayed this information to Zipkin and Huffman at RU and asked for their assistance with the next steps in reopening the investigation. No action was taken.

88.    In or about January 2020, Plaintiff's supervisor at MIT, Kanwisher learned about Azevedo's sexual harassment towards Plaintiff from one of her laboratory members to whom Plaintiff had confided. Kanwisher emailed Plaintiff to discuss the complaint in detail. Throughout the early January 2020 email exchange and telephone call, Plaintiff summarized the events of her complaint, shared her email to Poggio from May 2019, described the complaint process and its investigative procedural errors and revealed that other victims of Azevedo had come forward in the meantime, who were willing to corroborate her complaint.

89.    In or around January 2020, in New York, within Freiwald's laboratory, Plaintiff had been conducting regular meetings with Freiwald exclusively in his office. She had obtained results that were of interest and of satisfaction to Freiwald, therefore she sought his permission to submit an internal fellowship application based on them. However, Freiwald prohibited her from spending time on this, instructed her to submit the old application and provided other directives. Feeling that not reporting on project progress would compromise the quality of the application and her chances for the award, Plaintiff left the meeting in tears. She was financially dependent on Freiwald, and her whereabouts were closely tied to the visa sponsored by RU. It appeared that by not allowing her to submit the successful application, Freiwald was increasing this dependence.

90.    In or about early February 2020, the CBMM Directors denied Plaintiff the Teaching Assistant position for the 2020 Summer School. Plaintiff attempted to discuss this matter with Kanwisher but received no response. Despite Kanwisher's assurance to update Plaintiff on the result of the CBMM management audit, no communication was received from either Kanwisher.

91.     On or about February 13, 2020, Freiwald spontaneously requested a meeting with Plaintiff in his office the next day to discuss the project's future steps. During this meeting, Freiwald praised Plaintiff's project, discussing its potential and the transition to the project's electrophysiological phase and computational training. At some point, the meeting took a disturbing turn as Freiwald, with a smirking face, said it depends on her how she wanted to proceed. Freiwald's body language became suggestive, as he reclined in his chair and displayed a visible erection through his clothing. Freiwald kept smirking face and stayed in silence awaiting Plaintiff's reaction. She immediately felt embarrassed and quickly concluded the conversation and proceeded to leave the room.

92.     Freiwald then stood up from his chair and moved to open a door for her. As she was going out, she felt that Freiwald squeezed and slapped her buttocks. Later, Plaintiff expressed disbelief and lodged a complaint to her husband about the situation.

93.     On or about February 27, 2020, a subsequent office meeting was scheduled between Plaintiff and Freiwald. During a discussion about upcoming experiments, Freiwald made a sexually suggestive joke about a video featuring a monkey eating a banana. He emphasized the word "banana" with a suggestive smile, conveying a sexual connotation. Plaintiff felt uncomfortable but redirected the conversation back to scientific matters.

94.     Due to the Pandemic, no further in-person meetings occurred until an email exchange on or about May 28, 2020, addressing concerns regarding Plaintiff's funding for a postdoctoral position and project support. Freiwald, in an email on or about February 28, 2019, suggested continuing the conversation about Plaintiff's future career in person. Concerned about potential inappropriate behavior as experienced previously, Plaintiff declined this request, citing the limitations on personal contact and her discomfort with offsite meetings due to Freiwald's prior behavior.

95.     In a subsequent email on or about 29, 2020, Plaintiff expressed the need to set boundaries, stating a preference against attending professional meetings in restaurants, alluding to Freiwald's past inappropriate actions as the reason for her discomfort.

96.     On or about June 4, 2020, Freiwald responded to Plaintiff's email, requesting a Zoom meeting for the following day. During this meeting, he effectively terminated her employment by discontinuing her project and asking her to "wrap up things here".

97.     Plaintiff sent a follow-up email in an attempt to clarify what she perceived to be a misunderstanding. Freiwald replied that "there is no misunderstanding" and threatened to end her career if she stayed any longer.

98.     In or about July and August 2020, Plaintiff communicated with the laboratory manager about extending her contract. She reached out to Lihong Yin, the laboratory's Manager, on or about July 20, 2020, asking her to mediate the extension of her contract. Due to the mediation, she received an extension from Freiwald, but he upheld his decision to demote her work to limited research, just to finish things up as soon as possible.

99.     Furthermore, a laboratory survey revealed a hostile work environment. More than 50% of laboratory members experienced harassment and were afraid to speak up, with the majority of members expressing unhappiness. Freiwald addressed the results by refusing any change in the laboratory's culture, stating that it was his "philosophy".

100.     In or about December 2020, Plaintiff reported on her data. Freiwald approved and asked her to conduct an analysis to write a paper.

101.     In or about February 2021, Freiwald assigned an additional task to Plaintiff to write a review paper.

102.     At the same time, Plaintiff received a new visa and an appointment until 2024.

103.     On or about May 18, 2021, Plaintiff filed a sexual harassment and retaliation

complaint against Freiwald and RU with the New York State Division of Human Rights.

104.    On or about August 12, 2021, just two (2) weeks before her reappointment to a new Research Associate position, Freiwald sent Plaintiff an email informing her that both he and RU made the collective decision to terminate her employment at Ru effective November 30, 2021. Taken aback and at a loss for words, Plaintiff quietly resisted Freiwald's email notice. The termination came abruptly and at an inopportune time, as it occurred only three (3) months after the start of her new three-year Research Associate contract. It also abruptly interrupted her ongoing work that had been contracted with Freiwald earlier in 2021. Plaintiff submitted the review paper in or about September 2021. It was impossible for her to conclude the remaining work on other publications and write two (2) papers by November 30.

105.    On or about November 17, 2021, Plaintiff received an email from Michael Wiener (with others cc'd) from RU's HR Department. The email informed her that her last day of employment at the University would be November 30, 2021 and provided her with exit instructions.

106.    Subsequently, on or about November 24, 2021, Plaintiff received additional exit instructions from Freiwald's laboratory manager.

107.    In or about early 2022, RU withdrew its ongoing H-1B petition for Plaintiff's stay and offered her a one-way ticket to Poland.

108.    *Economic damages:*  As a consequence of Defendants' conduct, Plaintiff has suffered and will suffer harm, including lost past and future income and employment benefits, damage to her career, and lost wages, overtime, unpaid expenses, and penalties, as well as interest on unpaid wages at the legal rate from and after each payday on which those wages should have been paid, in a sum to be proven at trial.

109.    *Non-economic damages:*  As a consequence of Defendants' conduct, Plaintiff has suffered and will suffer psychological and emotional distress, humiliation, and mental and physical pain and anguish, in a sum to be proven at trial.

110.    *Punitive damages:*  The conduct of Defendants was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's protected civil rights, entitling Plaintiff to an award of punitive damages under federal law. In addition, Defendants' conduct constitutes malicious, willful, wanton and/or reckless indifference to Plaintiff protected rights, entitling Plaintiff to punitive damages against Defendants under State Law.

111.    *Attorneys' fees:*  Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

### FIRST CAUSE OF ACTION

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, *et seq*., and its Amendments for Gender and Sexual Harassment, *Quid Pro Quo* - Against All Defendants**

112.    The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

113.    Defendants' conduct, as alleged, violated Title VII, U.S.C. § 2000e, *et seq*. and its Amendments. Defendants committed unlawful employment practices, including by the following bases for liability:

(a)  Taking adverse employment actions against Plaintiff, such as discharging, barring, refusing to transfer, retain, hire, select, employ and/or otherwise discriminating against Plaintiff, in whole or in part, on the basis of Plaintiff's gender and/or sex violation of Title VII, U.S.C. § 2000e, *et seq.* and its Amendments;

(b) Plaintiff's gender and/or sex was a motivating factor in, among other things, Defendants' decision to ignore Plaintiff's good faith complaints about discrimination, abruptly ending Plaintiff's research project(s) after refusing to yield to or accept Defendant Friewald's sexual harassment and/or advancements, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's gender and/or sex.

114. As a proximate result of Defendants' willful, knowing and intentional discrimination against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress and physical and mental pain and anguish, all to her damages in a sum according to proof.

115. Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

116. Defendants' conduct constitutes malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights, and this entitles Plaintiff to punitive damages against Defendants.

## SECOND CAUSE OF ACTION

**Violation of the New York State Human Rights Law for Discrimination based on Gender and Sexual Harassment, *Quid Pro Quo* – Against All Defendants**

117. The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

118. The New York Executive Law §296(1)(a) provides that: "It shall be an unlawful discriminatory practice for an employer or licensed agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse or hire or employ or to bar or

to discharge from employment such individual in compensation or in terms, condition or privileges of employment."

119.  At all relevant times, Defendants were employers within the meaning of the New York State Human Rights Law.

120.  Defendants, through their employees, specifically Plaintiff's supervisor, Defendant Freiwald, subjected Plaintiff to a hostile work environment and sexual harassment, *quid pro quo*, which constitutes unlawful discrimination on the basis of sex.

121.  Defendant Freiwald sexually harassed Plaintiff by making unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.

122.  This conduct created a hostile, intimidating, and offensive work environment for Plaintiff.

123.  Defendant Freiwald conditioned Plaintiff's continued employment, its benefits, access to research done within Defendants' laboratories and opportunities on her submission to his sexual demands, which constituted *quid pro quo* sexual harassment.

124.  Despite being aware of the ongoing harassment, Defendants failed to take prompt and appropriate corrective action to stop the harassment and prevent its recurrence. In fact, they obstructed the proper investigation into Plaintiff's complaints of discrimination, sexual harassment, sexual assault, abuse and intimidation.

125. Instead of addressing the harassment, Defendants further retaliated against Plaintiff by terminating her employment and pending visa sponsorship application.

126. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and has endured, and continues to endure,

physical and mental pain and suffering.

127. Plaintiff seeks damages, including but not limited to compensatory damages, punitive damages, attorneys' fees, and costs, as well as injunctive relief to prevent further violations of the New York State Human Rights Law.

## THIRD CAUSE OF ACTION

**Violation of the New York City Human Rights Law for Discrimination based on Gender, Sexual Harassment, *Quid Pro Quo* and Hostile Work Environment – Against All Defendants**

128. The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

129. The New York City Administrative Code §8-107(1) provides that, "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

130. Defendants, through their employees, specifically Plaintiff's supervisor, Defendant Freiwald, discriminated against Plaintiff based on her gender and/or sex subjecting her to a hostile work environment, sexual harassment, *quid pro quo* and retaliation, which constitutes unlawful discrimination on the basis of gender and/or sex.

131. The conduct of Defendants were motivated by a gender-based animus, which had a disparate impact on Plaintiff and other women in Defendants' workplace.

132. Despite being aware of the ongoing harassment, Defendants failed to take prompt and appropriate corrective action to stop the harassment and prevent its recurrence.

133. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and has endured, and continues to endure, physical and mental pain and suffering.

134. Plaintiff seeks damages, including but not limited to compensatory damages, punitive damages, attorneys' fees, and costs, as well as injunctive relief to prevent further violations of the New York City Human Rights Law.

## FOURTH CAUSE OF ACTION

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, *et seq*., and its Amendments for Retaliation – Against All Defendants**

135. The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

136. Plaintiff engaged in protected activities when she made multiple complaints of discrimination to her Defendants' HR and legal counsel.

137. Plaintiff made multiple complaints, filed complaints with Defendants internally along with filing a police report regarding the 2017 sexual assault requesting no-contact order be issued by MIT or any of the other Defendant institutions to protect her at events Defendant Azevedo would be present at and experienced adverse employment actions as a result including, but not limited to, the following: ignoring Plaintiff's good faith complaints about discrimination, harassing her, intimidating her, preventing her from conducting research and working on projects and denying her visa sponsorship resulting in her departure home to Poland culminating in

removing Plaintiff from her role at RU. Such conduct is demonstrative of Defendants' reckless

indifference to the laws prohibiting discrimination.

138. By the acts and practices described above, Defendants retaliated against Plaintiff

for engaging in protected activities in violation of Title VII.

139. As a proximate result of the foregoing, Plaintiff has sustained loss of wages,

bonuses, benefits, promotional opportunities and other prerequisites of employment.

140. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and

is now suffering irreparable injury and monetary damages, including, without limitation, emotional

distress and pain and suffering, humiliation, and damage to reputation.

## FIFTHE CAUSE OF ACTION

**Violation of the New York State Human Rights Law § 296, *et seq*. for Retaliation – Against
All Defendants**

141. The allegations set forth in the foregoing paragraphs are re-alleged and

incorporated herein by reference.

142. New York State Executive Law §296(7) provides that it shall be an unlawful

discriminatory practice: "For any person engaged in any such activity to which this section applies

to retaliate or discriminate against any person because [s]he has opposed any practice forbidden

under this article."

143. Plaintiff engaged in protected activities when making multiple complaints of

discrimination against Defendants to her superiors, HR and Defendants' legal counsel, which were

blatantly ignored.

144. Plaintiff made multiple complaints and experienced adverse employment actions

as a result including, but not limited to, the following: ignoring Plaintiff's good faith complaints

about discrimination, sexual assault, sexual harassment, loss of her ability to research and

maintain her position in Freiwald's laboratory and loss of her visa sponsorship resulting in her departure home to Poland. Such conduct is demonstrative of Defendants' reckless indifference to the laws prohibiting discrimination.

145. By the acts and practices described above, Defendants retaliated against Plaintiff for engaging in protected activities in violation of the NYSHRL.

146. As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

147. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

## SIXTH CAUSE OF ACTION

**Violation of New York City Human Rights Law § 8-101, *et al*. For Retaliation for Engaging in Protected Activity — Against All Defendants**

148. The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

149. Defendants' conduct, as alleged, violated the New York City Human Rights Law, specifically § 8107(7) of the New York City Administrative Code, and Defendants committed unlawful employment practices including retaliating against Plaintiff by depriving her of conducting research in the U.S., maintaining her position in Freiwald's laboratory and loss of her visa sponsorship resulting in her departure home to Poland. for seeking to exercise rights guaranteed under the New York City Human Rights Law and/or for opposing Defendants' failure to provide such rights, including the right to be free from discrimination and harassment based on gender and/or sex in violation of § 8107(7) of the New York City Administrative Code.

150. As a proximate result of Defendants' willful, knowing and intentional

discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

151.  As a proximate result of Defendants' willful, knowing and intentional discrimination against Plaintiff, she has suffered and continues to suffer humiliation, emotional distress and physical and mental pain and anguish, all to her damage in a sum according to proof.

152.  As a proximate result of Defendants' creation of a hostile work environment based on discrimination that harmed Plaintiff, Plaintiff is entitled to compensatory damages.

153.  Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.  Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

154.  As a direct and proximate result of Defendants' unlawful termination, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation and career.

## <u>SEVENTH CAUSE OF ACTION</u>

### Civil battery Under the New York Adult Survivors Act  - Against Defendant Azevedo

155. The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

156. At all relevant times, Defendants are subject to the requirements of the New York Adult Survivors Act, which is a state law that allows adult survivors of sexual abuse to bring civil actions against their abusers and any responsible parties, regardless of when the abuse occurred.

157. In or about August 2017, Plaintiff was delegated by Defendant Freiwald to attend the CBMM Summer School in Woods Hole, Massachusetts. There, Plaintiff was raped by Defendant Azevedo.

158. Defendant Azevedo continued to target, abuse, assault and harass Plaintiff after the initial assault.

159. In or about March 15, 2018, Defendant Azevedo was delegated by Defendant MIT to travel to New York for a conference, and he raped Plaintiff at Defendant Rockefeller University's housing apartment.

160. Azevedo intended to commit above mentioned acts of unwanted contact and/or caused imminent apprehension of such an act against Plaintiff. He did so by, inter alia: (i) isolating Plaintiff in closed quarters and dismissing any bystanders; and (ii) demanding or threatening sexual contact.

161. Azevedo did commit an unwanted contact with Plaintiff in a harmful or offensive manner, including but not limited to causing sexual contact between Azevedo and Plaintiff, within the meaning of the New York Penal Law § 130.00(3).

162. Azevedo's actions constituted sexual offenses as defined in Article 130 of the New York Penal Law, including but not limited to criminal sexual act in the third degree (§ 130.40), sexual abuse in the third degree (§ 130.55), sexual misconduct (§ 130.20), and forcible touching (§ 130.52).

163. Plaintiff's claim for battery is thus timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j.

164. Plaintiff suffered severe and lasting physical, psychological, reputational and emotional injuries as a result of Defendant Azevedo's sexual abuse.

165. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has

suffered and continues to suffer harm, including but not limited to emotional distress, loss of educational and professional opportunities and out-of-pocket costs.

## EIGTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress - Against All Defendants

166. The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

167. At all relevant times, Defendants intentionally or recklessly subjected Plaintiff to a discrimination based on gender and/or sex, cultivated a hostile work environment, sexual harassment, *quid pro quo* and retaliation, which constitutes intentional infliction of emotional distress.

168. Defendants Azevedo and Freiwald, who was acting within the scope of their employment by Defendants, were the primary bad actors perpetrating this conduct. As a direct and proximate result of Defendants' intentional infliction of emotional distress, Plaintiff has suffered and continues to suffer severe emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and has endured, and continues to endure, physical and mental pain and suffering.

169. Plaintiff seeks damages, including but not limited to compensatory damages, punitive damages, attorneys' fees, and costs, as well as injunctive relief to prevent further intentional infliction of emotional distress by Defendants.

## NINTH CAUSE OF ACTION

### New York City Gender-Motivated Act – Against All Defendants

170. The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

171. Under the GMVA, the act of violence must have been motivated by the victim's

gender, meaning the perpetrator targeted the victim specifically because of their sex.

172. At all relevant times, Plaintiff Marciniak is a female.

173. The alleged act of violence must have occurred within the five boroughs of New York City.

174. During 2018 while in New York City, Plaintiff Marciniak alleged she was sexually assaulted by Defendant Azevedo. She also alleges she was sexually harassed by Defendant Freiwald on various occasions during her employment with Defendant RU, including, but not limited to, Freiwald forcibly touched her in or about May 2019 and in or about February 2020.

175. Plaintiff Marciniak demonstrates through the allegations in her Amended Complaint the physical, emotional, economic and reputational harm she suffered as a result of the gender-motivated violence perpetrated by Defendants.

176. Plaintiff Marciniak seeks damages, including but not limited to compensatory damages, punitive damages, attorneys' fees, and costs, as well as injunctive relief to prevent further physical and emotional harm.

177.  As a direct and proximate result of Defendants' unlawful termination, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation and career.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully request that this Court grant judgment against Defendants, as follows:

(a)    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violated the laws of the United States and the State of New York;

(b)    An award of damages against Defendants, in an amount to be determined at trial,

plus interest, to compensate Plaintiffs for all monetary and/or economic damages;

(c)    An award of damages against Defendants, in an amount to be determined at trial,

plus interest, to compensate for all non-monetary and/or compensatory damages, including but not

limited to, compensation for Plaintiffs' emotional distress;

(d)    For general and special damages according to proof;

(e)    For exemplary damages, according to proof;

(f)    For pre-judgment and post-judgment interest on all damages awarded;

(g)    For reasonable attorneys' fees;

(h)    For costs of suit incurred;

(i)    For an award of punitive damages in an amount to be determined at trial;

(j)    For an award of pre-judgment interest on all amounts due; and

(k)    For such other and further relief as the Court may deem just and proper.


Dated:  October 29, 2024                SHEGERIAN & ASSOCIATES


By:    *Olivia Clancy*
       Olivia M. Clancy, Esq.
       90 Broad Street, Suite 804
       New York, New York 10004
       Tel.: (212) 257-8883
       Fax: (212) 804-7299
       oclancy@shegerianlaw.com
       *Attorneys for Plaintiff*
       **DR. KAROLINA MARCINIAK- DOMINGUES
       GONCALVES AGRA**